774460.2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| AMERICAN EAGLE OUTFITTERS, INC. and AEO MANAGEMENT CO., | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| CITIGROUP GLOBAL MARKETS INC., | ) ) |
| Defendant. | ) ) |

Civil Action No.

**Electronically filed**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs American Eagle Outfitters, Inc. and AEO Management Co., a subsidiary of American Eagle Outfitters, Inc., (collectively "American Eagle" or the "Company") by their undersigned counsel, bring this action against Defendant Citigroup Global Markets Inc., formerly known as and the successor to Salomon Smith Barney Inc. ("Citi"), of which the following is a statement:

## PRELIMINARY STATEMENT

1.      This action arises out of Citi's false and misleading statements to, and material omissions from, American Eagle that induced the Company to purchase auction rate securities ("ARS") from Citi, and to continue purchasing those securities at a time when Citi knew the market for those instruments was collapsing.

2.      As detailed herein, Citi induced American Eagle to purchase Citi-brokered ARS by representing that ARS were safe, liquid instruments suitable to the Company's conservative investment policies, that Citi-brokered ARS had superior liquidity as compared to ARS offered by other institutions and that, unlike other ARS brokers, Citi, as the ARS "market leader," would

774460.2

provide immediate liquidity for the ARS it brokered by selling those securities to other Citi clients or purchasing the instruments for its own inventory.

3.    Citi failed to disclose to American Eagle that, contrary to Citi's representations, Citi's substantial and continuing purchases of Citi-brokered ARS for its own inventory was required to maintain liquidity in the ARS market because there was not enough third party demand to provide genuine liquidity for those securities. Citi also failed to disclose to American Eagle that Citi's purchases of Citi-brokered ARS for its own inventory were restricted by internal limits and that the market for Citi-brokered ARS would collapse if and when Citi stopped buying the securities.

4.    In reliance upon Citi's representations and omissions, American Eagle purchased Citi-brokered ARS from Citi between 2002 and February 2008.

5.    In August 2007, unbeknownst to American Eagle, whatever genuine, third party demand that had existed for ARS evaporated. In an effort to preserve its fee generating business and at the expense of its clients, including American Eagle, Citi sought to conceal the loss of liquidity by dramatically – albeit secretly – increasing its own purchases of Citi-brokered ARS. Citi concealed from American Eagle the distress in the ARS market, and continued to represent that ARS remained safe, liquid securities suitable to the Company's conservative investment policies and that Citi would never leave American Eagle holding illiquid Citi-brokered ARS.

6.    On or about February 12, 2008, without warning and contrary to its express representations to American Eagle and the parties' five-year course of dealing, Citi stopped providing liquidity for the ARS it had sold the Company. Citi's failure to use its own money to buy those securities rendered those instruments illiquid.

2

774460.2

7.     As a direct result of Citi's conduct, American Eagle now holds approximately $258 million of illiquid Citi-brokered ARS, most of which were purchased after February 11, 2007.

## THE PARTIES

8.     American Eagle Outfitters, Inc. and AEO Management Co. are corporations created and existing under the laws of Delaware, with their principal place of business in Pittsburgh, Pennsylvania.

9.     AEO Management Co. is a wholly owned subsidiary of American Eagle Outfitters, Inc. At all times material hereto, AEO Management Co. acted on behalf and/or for the benefit of American Eagle Outfitters, Inc.

10.     American Eagle Outfitters, Inc. is a leading clothing retailer that operates under the brands American Eagle Outfitters, aerie by American Eagle, MARTIN + OSA, and 77kids by American Eagle. American Eagle Outfitters, Inc., at least in part through and with the assistance of AEO Management Co., operates over 1,000 retail outlets in the United States and Canada, and currently employs approximately 30,000 people in the United States and Canada.

11.     Citi, formerly known as and the successor to Salomon Smith Barney Inc., is a New York corporation with its headquarters and principal executive offices in New York, New York. Citi, which is registered with the Securities and Exchange Commission as a broker-dealer, engages in a full service securities business, including retail and institutional sales, investment banking services, trading, and research.

12.     At all times relevant hereto, Citi and its predecessor, Salomon Smith Barney, Inc., acted as American Eagle's investment advisor and broker-dealer in connection with the ARS transactions.

774460.2

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 1332, and 1367.

14.    Venue is proper in this district pursuant to 15 U.S.C. § 78aa, because the defendant transacts business in this district.

## FACTS

**I.    American Eagle's
Conservative Investment Policy**

15.    American Eagle's business requires the Company to keep substantial funds readily available in the form of cash or highly-liquid assets with which to satisfy a variety of business contingencies.  To ensure the Company's assets are managed appropriately, American Eagle has developed an Investment Policy ("Investment Policy") setting forth the Company's investment objectives, as well as guidelines restricting investment of the Company's assets to instruments consistent with those objectives.

16.    American Eagle's Investment Policy sets forth the Company's investment objectives, in order of importance, as:  (i) preservation of capital; (ii) liquidity; (iii) control; and (iv) maximum yield in respect of the first three.

17.    To ensure preservation of capital, the Investment Policy restricts the Company to purchasing only high-quality, low-risk investments that carry high, investment-grade ratings.  To ensure its funds are kept liquid, the Company's Investment Policy limits purchases to instruments having a liquid "secondary market" into which American Eagle can sell the securities prior to maturity without losing significant value.  To ensure that American Eagle will never be trapped holding illiquid assets indefinitely – even if the "secondary market" for such

774460.2

securities dries up – the Company's Investment Policy restricts the Company to purchasing instruments that will mature in less than 13 months.

18.     American Eagle provides its Investment Policy to all financial institutions with whom the Company conducts investment or cash management business and requires outside financial institutions providing services to the Company to certify in writing each quarter that their sales of securities and provision of services to the Company comply with the Investment Policy.

**II.    Citi Markets ARS To American Eagle
         As Suitable Short-Term Investments**

19.     Prior to 2002, American Eagle did not conduct investment or cash management business with Citi; as of that time, the Company engaged another financial institution as its sole service provider in those areas.

20.     In 2002, American Eagle determined to engage at least one other financial institution to provide investment and cash management services to the Company.  Accordingly, in mid-2002, American Eagle solicited proposals from, and met with representatives of, several financial institutions – including Citi – that sought to obtain the business of providing such services to the Company.

21.     As part of this process, American Eagle provided each of these institutions, including Citi, with a copy of its Investment Policy.

22.     At all times material hereto, Citi was aware of the relationship between AEO Management Co. and American Eagle Outfitters, Inc., particularly that AEO Management Co. acted as American Eagle Outfitters, Inc.'s agent and representative with respect to cash management.

774460.2

23.     In response to American Eagle's request for proposal, Citi made both oral presentations and submitted written materials to American Eagle in which Citi touted the high level of investment and cash management expertise and service that it could provide the Company.  Moreover, Citi emphasized that its size and diversification would enable Citi to provide American Eagle access to a broad range of safe, high-quality, liquid investment instruments that would be suitable to, and consistent with, the Company's investment needs and conservative Investment Policy.

24.     During these presentations, Citi emphasized its ability, as the "market leader," to provide safe, liquid, high-quality ARS to American Eagle.

25.     ARS are long-term bonds and preferred stock with interest rates or dividend yields that are reset through periodic auctions, typically held every 7, 14, 28, or 35 days.  The auctions are intended to enable investors to liquidate easily their ARS at the end of each period. Based on the short intervals between auctions, ARS pay interest rates or dividend yields consistent with lower, short-term rates, but typically higher than those paid by treasuries or money market instruments.

26.     Financial institutions created and brokered ARS that were based on several types of debt obligations and other assets.  For example, brokers marketed ARS that were based on obligations of municipal governments, assets of closed-end investment funds, pools of federally insured student loans, and pools of complex derivative securities tied to various types of debt including subprime residential mortgages and commercial real estate loans.

27.     In the event that holders of ARS seeking to sell their securities at an auction outnumbered investors bidding for those instruments, the auction would be said to "fail."  In the event of a "failed" auction, none of the investors holding those ARS could sell their securities

6

774460.2

and the instruments would be illiquid until the next scheduled auction. During the holding period following a failed auction, the ARS generally would pay investors a higher "penalty rate" to penalize issuers, compensate investors for the temporary illiquidity, and create new liquidity by inducing new investors to step in and purchase the ARS to benefit from the higher interest rate. Penalty rates varied for different ARS and would be determined by the terms under which the particular security had been issued.

28.     Citi provided written materials to the Company representing that Citi was the "market leader" in ARS; that the ARS Citi brokered were the highest available quality; and that ARS were comparable to money market instruments in terms of safety and liquidity, stating that Citi-brokered ARS offered "[c]ompetitive short-term interest rates *compared with other money market instruments*." (emphasis added)

29.     In addition, Tony Gatto ("Gatto"), Citi's Director of Corporate Cash Management, made a number of oral representations to American Eagle that affirmed and expanded upon Citi's representations regarding ARS.

30.     In October 2002, Gatto represented to American Eagle that the ARS Citi sold were not only suitable to American Eagle's conservative Investment Policy, but were superior to ARS sold by other brokers.

31.     Specifically, Gatto represented to American Eagle that (i) Citi-brokered ARS were based on the highest quality credits, making those ARS the most sought after – and, accordingly, the most liquid – in the market; (ii) no matter what the outcome of the ARS auctions, Citi, as the ARS "market leader," could and would ensure liquidity for the ARS it brokered by finding other buyers from its purportedly expansive "book" of ARS customers, or, if necessary, by purchasing those securities for its own inventory; and (iii) unlike the ARS sold by

7

774460.2

other institutions, American Eagle would not need to wait until the scheduled auctions to sell Citi-brokered ARS because Citi, through its position as "market leader," could, and would, provide immediate liquidity for those securities by finding other buyers or purchasing those securities for its own inventory whenever the Company needed liquidity.

32.     Further, Gatto represented to American Eagle that, in light of the foregoing, Citi customers could be assured that they would never be left holding illiquid Citi-brokered ARS.

33.     In connection with its representations, Citi failed to disclose to American Eagle the numerous and conflicting roles Citi played in the ARS market, the extent of Citi's financial interest in maintaining that market for the purpose of generating fees for itself, or the degree to which Citi increased its own profits by selling Citi-brokered ARS rather than *bona fide* cash management instruments to its customers.

34.     Specifically, Citi did not disclose to American Eagle that:  (i) Citi's lucrative investment banking clients paid Citi substantial fees to structure, underwrite, and market Citi-brokered ARS for the purpose of providing those clients long-term financing at cheaper, short-term interest rates; (ii) Citi received substantial fees for managing the auctions through which Citi sold and resold those securities; or (iii) Citi's brokerage business reaped substantially higher fees from selling the Citi-brokered ARS to clients than it would have from selling *bona fide* cash management instruments.

35.     Moreover, Citi failed to disclose to American Eagle the true liquidity risks associated with Citi-brokered ARS, including the frequency with which:  (i) there were fewer bidders than sellers at auctions for Citi-brokered ARS; (ii) Citi was unable to locate buyers for Citi-brokered ARS from its "book" of ARS customers; or (iii) Citi was required to purchase Citi-brokered ARS for its own inventory to provide liquidity for those securities.

774460.2

36.     In fact, as Citi concealed from American Eagle, there was insufficient third party demand for Citi-brokered ARS to support the market for those securities and, accordingly, without Citi's substantial and continuing ability and/or willingness to purchase Citi-brokered ARS for its own inventory, those securities would become illiquid.

37.     Citi also failed to disclose to American Eagle that, contrary to Gatto's representations, Citi was not committed to ensuring liquidity for all Citi-brokered ARS.

38.     Rather, as Citi knew, but concealed from American Eagle, Citi management had imposed a limit on the amount of ARS Citi would purchase for its own inventory, which amount was only a fraction of the total value of all Citi-brokered ARS. Further, Citi management had mandated that, upon reaching that limit, Citi would stop purchasing ARS for its own inventory, allowing the market to collapse, thereby trapping investors with illiquid securities.

39.     In reliance on Citi's representations and omissions, including the written materials Citi provided to American Eagle and Gatto's oral statements to American Eagle, in and around October 2002, American Eagle engaged Citi to provide investment and cash management services to the Company, and as part of this engagement, American Eagle Outfitters and Citi's predecessor, Salomon Smith Barney, executed an Institutional New Account Authorization dated October 3, 2002 ("Account Agreement"), incorporating the Company's Investment Policy.

40.     The Account Agreement restricted Citi to offering American Eagle securities that met the suitability criteria set forth in the Investment Policy, and required Citi to provide quarterly certifications to the Company that Citi had complied with the Investment Policy.

41.     Citi was provided with a copy of American Eagle's Investment Policy for each year thereafter.

774460.2

42.     For each quarter thereafter during the time period in which Citi provided services under the Account Agreement, as more specifically described herein, Citi provided a written certification that it had complied with American Eagle's Investment Policy.

43.     In reliance on Citi's representations and omissions, American Eagle began purchasing Citi-brokered ARS from Citi in 2002.

44.     Thereafter (and, as discussed herein, continuing until February 2008), Citi and American Eagle entered into a course of dealing consistent with Citi's oral and written representations to American Eagle; namely: (i) Citi made available to American Eagle sufficient amounts of highly-rated Citi-brokered ARS to meet the Company's investment needs; (ii) American Eagle was able to liquidate Citi-brokered ARS at the scheduled auctions; and (iii) when requested, Citi liquidated Citi-brokered ARS before the end of the "holding period," thereby providing immediate liquidity for those securities.

### III.    Citi Induces American Eagle to Increase its Purchases of Citi-Brokered ARS

45.     In or about July 2004, ARS that American Eagle had purchased from another financial institution had failed to sell immediately at auction, requiring several additional weeks to sell. When American Eagle discussed this situation with Gatto in or about July 2004, Gatto represented that the ARS brokered by the other financial institution had failed to sell as scheduled because: (i) those ARS did not generate the level of demand that existed for Citi-brokered ARS because they were riskier, lower quality instruments; (ii) the other brokerage was not as large and diverse an ARS marketer as Citi – the ARS "market leader" – and, accordingly, did not have a big enough "book" of ARS clientele to locate a purchaser for the securities American Eagle wished to sell; and (iii) the other institution had not, itself, provided immediate

10

774460.2

liquidity for those ARS because it was a smaller, less committed participant than Citi in the ARS market.

46. At no time did Gatto suggest that there was any systemic fault with the ARS auction market. Rather, he reassured American Eagle that Citi-brokered ARS remained safe, liquid and suitable investments for American Eagle.

47. Citi also used this occurrence as an opportunity to induce American Eagle to reduce its ARS purchases from other institutions and increase the Company's purchase of Citi-brokered ARS.

48. Specifically, Gatto represented to American Eagle that, unlike the ARS brokered by other institutions: (i) Citi-brokered ARS were of the highest quality and, accordingly, reliably generated ample bids to cover all sellers at auction; (ii) Citi remained the largest ARS broker and, accordingly, had superior access to ARS purchasers to whom it could sell any ARS the Company wished to liquidate; and (iii) Citi remained committed to the ARS market, would always purchase Citi-brokered ARS for its own inventory in the unlikely event no other buyers could be found, and would never allow American Eagle to be left holding an illiquid Citi-brokered ARS.

49. In reliance on Citi's representations as supported by the parties' course of dealing, American Eagle reduced its ARS purchases from other financial institutions and increased its purchases of Citi-brokered ARS from Citi.

774460.2

IV.     **Citi Conceals from American Eagle Distress
        in the ARS Market and Induces American
        Eagle to Continue Purchasing Citi-Brokered ARS**

      A.     **Citi Conceals the Loss
                of Third Party Liquidity**

50.     In the spring of 2007, continuing distress in the market for subprime mortgages led rating agencies to downgrade complex derivative securities based on such debt, causing the values of those instruments to plummet. Recognizing that the developing subprime mortgage crisis would destroy the value of ARS based on complex derivatives tied to such loans and other risky debt ("Derivative ARS"), brokers that marketed Derivative ARS stopped buying such securities for their own inventories to avoid getting stuck with those "toxic" instruments.

51.     As a result, at least 96 auctions for ARS tied to complex derivatives failed in August and September 2007, leaving investors stranded with nearly $9 billion of illiquid securities.

52.     Although Citi had not marketed Derivative ARS, Citi recognized the threat those failures posed to Citi's ARS franchise because, as Citi later conceded in an internal email, "if one segment of the ARS market experiences fails, there is a high probability that investors will lose confidence in all sectors and asset types funded in the ARS market."

53.     Citi knew that because it had marketed Citi-brokered ARS to investors, including American Eagle, as safe, highly liquid, and superior to other institutions' securities, even a few failed auctions would trigger a run on the bank causing an immediate and chaotic collapse of the market for its ARS. Citi concluded that such an event would not be in Citi's own commercial best interests.

54.     To avert widespread auction failures and an immediate collapse of the market for Citi-brokered ARS, Citi increased dramatically – albeit secretly – its purchases of those

774460.2

securities for its own inventory.  Nevertheless, ARS liquidity continued to fall, and by the middle

of August 2007, Citi had reached its internal limit of Citi-brokered ARS purchases it could make

to prevent auctions for those securities from failing.

55.      Facing an immediate collapse of the market for its securities, Citi's ARS desk

advised Citi management by email dated August 16, 2007, that, "[w]e need to discuss the current

state of the auction rate market, our commitment to the auctions, its impact on our balance sheet

and the effect of our actions on our clients[.]"  The email went on to warn that "our actions will

have broad-reaching implications to all of our constituents, the market, and our franchise."

56.      Thereafter, Citi management granted an emergency increase in Citi's ARS limit.

Although this extension enabled Citi to continue, for the time being, purchasing Citi-brokered

ARS for its own inventory to conceal the dire state of liquidity for those securities, the market

had become so illiquid that Citi completely exhausted its extended limit within two weeks.

57.      In an August 30, 2007 email, Citi's ARS desk advised brokers that "[w]e are

currently at our extended limit," and instructed them to "[m]ake sure you don't leave any stones

unturned today . . .  Hit all bids . . . Times like these, we need to do whatever is necessary.  Just

make sure all hands are on deck and paper is sold."

58.      Despite its desperate efforts to sell off ARS from its burgeoning inventory, the

market for Citi-brokered ARS was so overloaded with sellers and so short of buyers that Citi

management was forced to grant multiple emergency extensions of Citi's ARS limit to enable the

ARS desk to continue purchasing Citi-brokered ARS to conceal from investors the fact that those

securities had become illiquid.

774460.2

59.     Throughout this time, Citi continued to sell American Eagle Citi-brokered ARS, representing that those securities were safe, liquid, suitable to the Company's Investment Policy and superior to ARS brokered by other institutions.

60.     At no time did Citi advise American Eagle, nor was American Eagle otherwise aware, that:  (i) Citi had increased its ARS purchases to conceal the loss of liquidity in the market, (ii) Citi's purchases had caused Citi to reach and exceed that limit multiple times; or (iii) that liquidity for Citi-brokered ARS existed only through management's discretionary extensions of Citi's internal ARS limit.

### B.     Citi Conceals its Manipulation of ARS Interest Rates

61.     At the time Citi first marketed ARS to American Eagle, and at all times thereafter, Citi represented to the Company that, while those securities were as safe and liquid as money market instruments, ARS paid higher yields because their interest rates were set by the competitive bids of third party investors.  However, as a result of the disappearance of genuine, third party demand for Citi-brokered ARS in and after August 2007, there were typically not enough bids to set interest rates for those securities through a *bona fide* process.

62.     Rather than disclose that there was no longer sufficient demand to set interest rates for Citi-brokered ARS through competitive bidding, Citi itself stepped in and determined unilaterally, and secretly, what interest rates its ARS would pay.

63.     Moreover, Citi typically set the interest rates on Citi-brokered ARS artificially high in the hopes of reducing its exploding inventory by making those securities appear more attractive to investors.  However, the increased financial demand on the issuers of paying the higher interest rates made the ARS materially riskier, sometimes forcing the issuers to obtain temporary waivers from the rating agencies to avoid having their high credit ratings slashed.

774460.2

64.     Although Citi continued to sell Citi-brokered ARS to American Eagle, Citi failed to disclose that:  (i) there were no longer sufficient third party bids to set interest rates through a *bona fide* process; (ii) Citi was unilaterally – and secretly – setting interest rates artificially high to make those securities appear more attractive as investments; (iii) the artificially high interest rates put additional strains on the ARS issuers, materially impacting the securities' credit quality; and (iv) in some cases, those ARS maintained their high credit ratings only through temporary waivers from the rating agencies.

**C.     Citi Induces American Eagle
to Purchase Citi-brokered
Student Loan and Closed-end Fund ARS**

65.     In late 2007, American Eagle asked Gatto how best to protect the safety and liquidity of American Eagle's cash portfolio from the fallout of the crisis in subprime mortgages and their related securities.  In response, Gatto advised American Eagle to direct more of its cash into certain Citi-brokered ARS – specifically, those based on federally insured student loans ("SLARS") and those issued by closed-end investment funds ("CEF ARS").

66.     Gatto represented to American Eagle that Citi-brokered SLARS were based on the highest-quality student loans backed by the United States government under the Federal Family Education Loan Program ("FFELP") and that Citi-brokered CEF ARS were issued by blue chip investment funds that provided at least $2 of collateral for every $1 of ARS they issued.

67.     Accordingly, Gatto represented SLARS and CEF ARS would provide American Eagle the highest degree of safety, liquidity and protection from the subprime mortgage crisis because those securities enjoyed reliable demand and liquidity due to their high quality, as confirmed by their high credit ratings, and were not connected to the market for subprime mortgages and related securities.

15

774460.2

68. Further, Gatto advised American Eagle that, because SLARS and CEF ARS enjoyed the benefit of federal guarantees or substantial collateral support, their high credit ratings were not dependent on guarantees provided by the so-called "monoline" insurance companies, as was the case with many other ARS types. Gatto advised American Eagle that Citi was recommending that its cash management clients purchase Citi-brokered SLARS and CEF ARS, which Gatto represented would not be affected by issues relating to the monoline insurers.

69. Finally, Gatto represented that, like all Citi-brokered ARS, Citi-brokered SLARS and CEF ARS were superior to similar instruments brokered by other institutions because they benefited from Citi's status as ARS "market leader." Consistent with Citi's past representations, Gatto advised that Citi would provide immediate liquidity for those securities by finding other investors to purchase those instruments or, in the alternative, purchasing the ARS for Citi's own inventory.

70. Neither Gatto, nor anyone at Citi, advised American Eagle that, at the same time Gatto was soliciting American Eagle to purchase Citi-brokered SLARS and CEF ARS, Citi was advising its management internally that those securities would be among the first Citi would allow to fail and become illiquid.

71. Unlike certain other Citi-brokered ARS that would pay holders extremely high penalty rates in the event of an auction failure – as much as 15% to 20% – Citi-brokered SLARS and CEF ARS would typically pay penalty rates set by formulas that were *lower* than market rates for similar instruments. When the market collapsed – as Citi anticipated, but concealed from American Eagle – Citi did not want to be left holding illiquid securities paying below market interest. Accordingly, Citi sought to offload such securities onto its customers, including American Eagle.

774460.2

72.    Notably, in December 2007, at the same time that Gatto was touting the continuing safety and liquidity of Citi-brokered SLARS and CEF ARS, Citi circulated internally a draft plan for auction failures stating that, "[i]f we are forced to fail on a specific asset type of auction rate securities, we would try to differentiate between the program structures that failed because max rates were set too low and all other program structures which can support high max rates."  Citi concluded that "Citi will support above market, fixed maximum rates [while] remainder of market with formulaic maximum rates [*i.e.*, SLARS and CEF ARS] will not be supported and will fail."

73.    Simply put, Citi would seek to ensure that its customers, such as American Eagle, were the ones left holding the worst securities when the market collapsed.

74.    Similarly, Gatto's representations to American Eagle that Citi-brokered SLARS and CEF ARS were safe because they were insulated from rating agency downgrades of the monoline insurers are belied by Citi's own internal communications.

75.    Indeed, Citi acknowledged in an internal email dated November 1, 2007, that "[e]ven apart from the potential of a monoline downgrade, the ARS market is subject to a potential liquidity crisis," and that "the ARS market has been under pressure caused by investor risk aversion and other dealers' failed auctions[.]"  The email goes on to state that, "[a]s a result, liquidity has been thin."

76.    In a December 7, 2007 internal email, Citi confirmed that senior Citi officials, "don't have much of a problem letting them [ARS] go if times get much tougher."  Thereafter, in a December 24, 2007 internal email, Citi conceded that a failed auction at Citi "seems like an unavoidable eventuality."

17

774460.2

77. At no time did Citi advise American Eagle that: (i) "the ARS market is subject to a potential liquidity crisis;" (ii) "[ARS] liquidity has been thin;" (iii) a failure of Citi-brokered ARS "seems like an unavoidable eventuality;" or (iv) Citi-brokered SLARS and ARS "will not be supported and will fail."

78. In reliance on Citi's representations and omissions, as supported by the parties' course of dealing, American Eagle did not liquidate holdings of its Citi-brokered ARS, and instead, sold certain of its other holdings, using the proceeds to purchase Citi-brokered SLARS and CEF ARS.

## V.     Citi Reasserts its Commitment to Provide Liquidity Just Before Stranding American Eagle with More than $300 Million of Illiquid ARS

79. In or about January 2008, another financial institution from whom American Eagle had purchased ARS advised the Company that there were delays in liquidating ARS that institution had brokered.

80. Knowing that it would soon need a large sum of cash to conclude a strategic transaction, American Eagle contacted Gatto to discuss this situation, advise Gatto of the Company's upcoming liquidity requirement, and ask whether there were any potential delays, failures or other issues relating to Citi-brokered ARS.

81. Gatto responded that he was aware of the other institution's difficulties, but that the ARS brokered by that institution were of poor quality and tied to high-risk investments. Gatto assured American Eagle that strong investor demand for the high-quality, Citi-brokered ARS would ensure continuing liquidity for those instruments. Moreover, Gatto reiterated that Citi, as the ARS "market leader," would always be able to find buyers for those securities and, in any event, would always buy those securities for its own inventory if necessary.

774460.2

82.     In reliance on Citi's representations and omissions and the parties' course of dealing, American Eagle continued to hold Citi-brokered ARS it had purchased and to purchase Citi-brokered ARS.

83.     In early February 2008, American Eagle noticed that interest rates being paid by Citi-brokered ARS had increased significantly.  American Eagle deemed it prudent to inquire as to whether the increase in interest rates reflected any risk as to the Citi-brokered ARS, or whether there were any other issues or concerns relating to those securities of which the Company should be aware.

84.     Accordingly, on or about February 6, 2008, American Eagle communicated with Gatto via email.  Gatto indicated that there were no concerns with Citi-brokered ARS, and reiterated that Citi was "optimistic that we will not have any auction fails."  The next day, Gatto told American Eagle that "[Citi's auction rate] desk has never let [an auction] fail, we won't," and that "the cash desk told us don't worry."

85.     The next day, however, a Citi ARS trader stated internally in an email that "[p]anic is now clearly evident with both retail and institutional customers" and Citi instructed its brokers to "sell anything you can" and "if there is an opportunity to reduce our book, then we have to hit it ASAP."

86.     Given the difficulty that the other financial institution from whom it purchased ARS was having in providing liquidity for those instruments, and in light of the importance to the Company of having unfettered access to its cash, American Eagle decided over the next several days that it would direct Citi to begin liquidating its holdings of Citi-brokered ARS.

87.     On February 11, 2008, American Eagle so directed Gatto.  That same day, Gatto advised American Eagle that, contrary to Citi's continuing representations and inconsistent with

19

774460.2

the parties' course of dealing over the prior five years, Citi would not provide liquidity for any Citi-brokered ARS, including the Citi-brokered SLARS and CEF ARS that Citi had touted as safe and liquid just a few weeks earlier.

88.     Thereafter, American Eagle discovered that, without Citi stepping in to provide liquidity for the Citi-brokered ARS, all but a small handful of those securities were illiquid because, contrary to Citi's representations, there was not enough third party demand to keep the auctions from failing, regardless of the securities' purported high credit quality.

89.     Accordingly, as of February 11, 2008, American Eagle found itself trapped with more than $258 million of illiquid Citi-brokered ARS.

90.     Prior to February 11, 2008, American Eagle was not aware that continuing liquidity for Citi-brokered ARS depended on Citi's purchases of those securities for its own inventory, or that, as early as fall 2007, Citi had begun contemplating ending its practice of making such purchases, which conduct would, and did, render illiquid the ARS Citi had sold to American Eagle.

91.     By the next day, all other ARS brokers had ended their decades-long practice of purchasing ARS for which there was no third party demand.  As a result, the entire ARS market collapsed, saddling countless investors with hundreds of billions of dollars of illiquid securities.

92.     In the succeeding months, Citi sought to conceal that it had, for at least seven months before the ARS market collapse, anticipated, planned for, and positioned itself for that event.  Indeed, Citi represented to investors and regulators that February's events had caught Citi completely off-guard.

93.     For example, Citi published a report two weeks after the February collapse claiming that, "the magnitude of the liquidity crunch that developed as a result of auction failures

774460.2

was not expected given that the market has operated smoothly for almost 25 years," and that "market conditions changed drastically in mid-February [2008] as sellers overwhelmed potential buyers, causing widespread auction failures in ARS for the first time."

94.     As Citi knew, but concealed from American Eagle, other investors, and regulators, ARS market conditions had changed drastically at least seven months earlier, when sellers overwhelmed potential buyers, causing widespread auction failures in August 2007.

95.     After ten months of Citi's efforts to shirk its responsibility for leaving tens of thousands of paying customers stranded with approximately $45 billion of illiquid ARS, the Securities and Exchange Commission brought a securities fraud lawsuit against Citi in the District Court for the Southern District of New York in December 2008.

## VI.    Citi's Conduct Has <u>Harmed American Eagle</u>

96.     As a direct result of Citi's conduct, American Eagle is currently holding nearly $258 million of illiquid, Citi-brokered ARS that can be sold only at a material discount, if at all.

97.     In addition to the loss of principal value, the illiquidity of the Citi-brokered ARS has left American Eagle unable to access this substantial portion of its cash, causing the Company to turn to borrowed funds to ensure its uninterrupted operations.  American Eagle has also been forced to reduce its business activities and forego strategic transactions due to a lack of immediately available capital.  Further, because American Eagle has unable to access this substantial portion of its cash, the Company has been required to incur the expense related to and to rely upon borrowed funds to ensure its uninterrupted operations.

774460.2

## COUNT I
### (Fraud in Violation of Section 10(b) of the Securities
### and Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)

98.     American Eagle incorporates by reference the allegations of paragraphs 1 through 97 as though the same were set forth herein in their entirety.

99.     At all times relevant hereto, by use of means or instrumentalities of interstate commerce, Citi employed a device, scheme or artifice to defraud American Eagle with respect to the sale of ARS; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices or courses of business which operated as a fraud and deceit upon American Eagle in connection with the sale and purchase of ARS.

100.    As set forth previously, Citi deliberately and intentionally deceived American Eagle by making numerous and repeated oral and written misrepresentations regarding the safety and liquidity of ARS, that these securities met the requirements of American Eagle's investment policies, that the Citi-brokered ARS were superior to those offered by other institutions, and that Citi would provide immediate liquidity for the ARS it brokered.

101.    In addition, as set forth previously, Citi deliberately and intentionally failed to disclose the material facts alleged herein, including Citi's failure to disclose that there was insufficient third party demand to provide liquidity for the Citi-brokered ARS, that its own purchases of Citi-brokered ARS for its own inventory was required to maintain liquidity, that Citi's purchases were limited by its own internal controls and that the market would collapse when and if Citi ceased to purchase ARS, which material facts rendered its conduct deceptive, and its representations and omissions false and misleading.

774460.2

102.    American Eagle reasonably relied to its detriment upon Citi's material misrepresentations and omissions of material fact and fraudulent conduct by purchasing and holding nearly $258 million of Citi-brokered ARS which are now illiquid.

103.    By virtue of its conduct, Citi has violated Section 10(b) of the Exchange Act, 15 U.S.C. §78(j)(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R.§240.10b.5.

104.    As a direct and proximate consequence of the fraudulent misrepresentations and omissions of Citi, American Eagle has suffered damages for which it is entitled to be compensated from Citi.

WHEREFORE, Plaintiffs American Eagle Outfitters, Inc. and AEO Management Co. demand judgment in their favor and against Defendant Citigroup Global Markets, Inc. for compensatory damages in excess of $75,000, together with rescission of all purchases of ARS, punitive damages, costs and such other relief permitted by law and/or as the Court may deem to be appropriate.

### COUNT II
### (Fraud in Violation of Sections 1-401 and 1-501 of the Pennsylvania Securities Act)

105.    American Eagle incorporates by reference the allegations of paragraphs 1 through 97 as though the same were set forth herein in their entirety.

106.    At all times relevant hereto, by use of means or instrumentalities of interstate commerce, Citi employed a device, scheme or artifice to defraud American Eagle with respect to the sale of ARS; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices or courses of business which operated as a fraud and deceit upon American Eagle in connection with the sale and purchase of ARS.

23

774460.2

107. As set forth previously, Citi deliberately and intentionally deceived American Eagle by making numerous and repeated oral and written misrepresentations regarding the safety and liquidity of ARS, that these securities met the requirements of American Eagle's investment policies, that the Citi-brokered ARS were superior to those offered by other institutions, and that Citi would provide immediate liquidity for the ARS it brokered.

108. In addition, as set forth previously, Citi deliberately and intentionally failed to disclose the material facts alleged herein, including Citi's failure to disclose that there was insufficient third party demand to provide liquidity for the Citi-brokered ARS, that its own purchases of Citi-brokered ARS for its own inventory was required to maintain liquidity, that Citi's purchases were limited by its own internal controls and that the market would collapse when and if Citi ceased to purchase ARS, which material facts rendered its conduct deceptive, and its representations and omissions false and misleading.

109. American Eagle reasonably relied to its detriment upon Citi's material misrepresentations and omissions of material fact and fraudulent conduct by purchasing and holding nearly $258 million of Citi-brokered ARS which are now illiquid.

110. By virtue of its conduct, Citi has violated Sections 1-401 and 1-501 of the Pennsylvania Securities Act, 70 Pa. Stat. Ann. §§ 1-401, 1-501.

111. As a direct and proximate consequence of the fraudulent misrepresentations and omissions of Citi, American Eagle has suffered damages for which it is entitled to be compensated from Citi.

WHEREFORE, Plaintiffs American Eagle Outfitters, Inc. and AEO Management Co. demand judgment in their favor and against Defendant Citigroup Global Markets, Inc. for compensatory damages in excess of $75,000, together with rescission of all purchases of ARS,

774460.2

punitive damages, costs and such other relief permitted by law and/or as the Court may deem to be appropriate.

## COUNT III
### (Violation of Section 1-501 of the Pennsylvania Securities Act)

112.    American Eagle incorporates by reference the allegations of paragraphs 1 through 97 and 106 through 109 as though the same were set forth herein in their entirety.

113.    Citi made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading, in connection with the sale and purchase of ARS, in violation of Sections 1-501 of the Pennsylvania Securities Act, 70 Pa. Stat. Ann. § 1-501.

114.    American Eagle reasonably relied upon Citi's representations by purchasing and holding nearly $258 million of Citi-brokered ARS which are now illiquid.

115.    As a direct and proximate consequence of the fraudulent misrepresentations and omissions of Citi, American Eagle has suffered damages for which it is entitled to be compensated from Citi.

WHEREFORE, Plaintiffs American Eagle Outfitters, Inc. and AEO Management Co. demand judgment in their favor and against Defendant Citigroup Global Markets, Inc. for compensatory damages in excess of $75,000, together with rescission of all purchases of ARS, punitive damages, costs and such other relief permitted by law and/or as the Court may deem to be appropriate.

## COUNT IV
### (Common Law Fraud)

116.    American Eagle incorporates by reference the allegations of paragraphs 1 through 97 as though the same were set forth herein in their entirety.

25

774460.2

117.    As set forth herein, Citi deliberately and intentionally deceived American Eagle by making material misrepresentations and omissions of material fact to American Eagle in connection with the sale of ARS to American Eagle.

118.    Citi had actual knowledge of the falsity of these misrepresentations and omissions, or in the alternative, acted with reckless disregard for their truth.

119.    Citi's fraudulent misrepresentations and omissions were made knowingly and deliberately for the express purpose of concealing the truth about the liquidity and risks of ARS and for supporting the ARS market for its own gain.

120.    Citi intended that American Eagle rely on Citi's misrepresentations and omissions.

121.    American Eagle reasonably and justifiably relied to its detriment upon Citi's material misrepresentations and omissions of material fact and fraudulent conduct by purchasing and holding nearly $258 million of Citi-brokered ARS which are now illiquid.

122.    As a direct and proximate consequence of the fraudulent misrepresentations and omissions of Citi, American Eagle has suffered damages for which it is entitled to be compensated from Citi.

WHEREFORE, Plaintiffs American Eagle Outfitters, Inc. and AEO Management Co. demand judgment in their favor and against Defendant Citigroup Global Markets, Inc. for compensatory damages in excess of $75,000, together with rescission of all purchases of ARS, punitive damages, costs and such other relief permitted by law and/or as the Court may deem to be appropriate.

774460.2

## COUNT V
**(Negligent Misrepresentation)**

123.    American Eagle incorporates by reference the allegations of paragraphs 1 through 122 as though the same were set forth herein in their entirety.

124.    In the alternative, Citi negligently and carelessly made material misrepresentations and omitted material facts to American Eagle in connection with the sale of ARS to American Eagle.

125.    Citi should have known that these representations were false and misleading but failed to exercise due care in connection with said representations and omissions.

126.    American Eagle reasonably relied to its detriment upon Citi's negligent misrepresentations and omissions of material fact by purchasing and holding nearly $258 million of Citi-brokered ARS which are now illiquid.

127.    As a direct and proximate consequence of the negligent misrepresentations and omissions of Citi, American Eagle has suffered damages for which it is entitled to be compensated from Citi.

WHEREFORE, Plaintiffs American Eagle Outfitters, Inc. and AEO Management Co. demand judgment in their favor and against Defendant Citigroup Global Markets, Inc. for compensatory damages in excess of $75,000, together with rescission of all purchases of ARS, punitive damages, costs and such other relief permitted by law and/or as the Court may deem to be appropriate.

**A JURY TRIAL IS DEMANDED.**

774460.2

Respectfully submitted,

MEYER, UNKOVIC & SCOTT

By: _/s/ Patricia L. Dodge_
        Patricia L. Dodge
        PA I.D. #35393
        pld@muslaw.com

        Richard T. Victoria
        PA I.D. #76681
        rtv@muslaw.com

535 Smithfield Street, Suite 1300
Pittsburgh, PA 15222-2315
Tel.: (412) 456-2800
Fax: (412) 456-2864

OF COUNSEL:

Christopher P. Johnson
NY I.D. #2109395
CJohnson@kasowitz.com

Charles M. Miller
NY I.D. #2916096
CMiller@kasowitz.com

Kasowitz, Benson,
Torres & Friedman LLP
1633 Broadway
New York, NY 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

Attorneys for Plaintiffs American Eagle
Outfitters, Inc. and AEO Management Co.